UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————————X

GEORGE GOUVATSOS,

                 Petitioner,

      -against-                     **OPINION & ORDER**
                                             08-CV-2049 (SJF)

ROBERT ERCOLE, Superintendent,

                 Respondent.

——————————————————————————X

FEUERSTEIN, J.

      On October 28, 2003, a judgment of conviction was entered against petitioner George Gouvatsos ("petitioner") in the Supreme Court of the State of New York, Queens County (Erlbaum, J.), upon a jury verdict finding him guilty of attempted murder in the second degree (N.Y. Penal Law §§ 110.00, 125.25); two (2) counts of assault in the first degree (N.Y. Penal Law § 120.10(3)); assault in the second degree (N.Y. Penal Law § 120.05(2)); aggravated criminal contempt (N.Y. Penal Law § 215.52); three (3) counts of criminal contempt in the first degree (N.Y. Penal Law § 215.51(d)); criminal contempt in the second degree (N.Y. Penal Law § 215.50(3)); assault in the third degree (N.Y. Penal Law § 120.00(1)(2)); and two (2) counts of criminal possession of a weapon in the fourth degree (N.Y. Penal Law § 265.01); and imposition of sentence. On May 12, 2008, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. §2254.

      For the reasons set forth herein, the petition is denied and the proceeding is dismissed.

# I.  BACKGROUND

## A.  Factual Background

The following facts were taken from the transcripts of the <u>Sandoval</u> hearing (H.), trial (T.) and sentencing (S.):

### 1.  Sandoval Hearing

On September 3, 2003, the trial court held a <u>Sandoval</u> hearing to determine whether the prosecutor could cross-examine petitioner, should he testify at trial, regarding his 1996 conviction, upon his plea of guilty, of assault with intent to cause serious physical injury (N.Y. Penal Law § 120.05(1)) and prior bad acts.  The trial court ruled that the prosecutor could cross-examine petitioner regarding his 1996 assault conviction since, *inter alia*, petitioner's guilt of that crime was established by his plea and the conviction was probative of petitioner's honesty and willingness to put his own interests above society's "in a very significant way."  (H. 10-12). The trial court also ruled that the prosecutor could cross-examine petitioner regarding "the alleged polygamous relationship" he had with his wife, the victim of his alleged crime.  (H. 12).

### 2.  The Trial

#### a.  The Prosecutor's Case

The complaining witness Teoginis Familia ("Familia") testified that she met petitioner in the early 1980's; that they were married in a civil ceremony in the Dominican Republic, her

native country, approximately a year and a half later; and that they had a son in 1990. (T. 207-209, 234, 308-10).

On September 10, 2002, Familia lived with petitioner and their then 12-year-old son in a private house that she owned in Whitestone, New York. (T. 208-10, 326-9). In the morning of that date, Familia argued with petitioner about phone calls she had received from Henry Ruis ("Ruis"), a man she had been dating. (T. 210, 315). During that argument, petitioner kicked Familia four (4) to five (5) times in her legs while wearing construction boots; punched her several times in her chest and ribs while demanding to know who had called her the night before; and punched her in the forehead. (T. 211-2). When Familia attempted to flee, petitioner caught her outside the home, dragged her by her head and kicked her in her leg and back. (T. 213, 215).

The events outside Familia's house were witnessed by her neighbor Paraskevi, a/k/a "Patty", Paxinos ("Paxinos"). (Familia: T. 213-4; Paxinos: T. 368-70). When Paxinos said to petitioner: "You don't hit women like that," petitioner instructed Paxinos to "take" Familia before the situation escalated further. (Familia: T. 214; Paxinos: T. 371). Paxinos took Familia to her home, where Familia called the police. (Familia: T. 216). By the time the police responded, petitioner had left. (Familia: T. 232). Familia informed the responding officers that she did not need ambulatory assistance and that she preferred to be treated at Metropolitan Hospital, where she was employed as a nurse. (T. 217, 359-61).

Petitioner returned to Familia's house on two (2) occasions that same day. (T. 232). On one of those occasions, petitioner and Familia again argued and petitioner again kicked Familia, so she called the police back to the house. (T. 232). Although petitioner was present when the

3

officers responded the second time, he was not arrested. (T. 232). However, the officers escorted petitioner out of the house and directed him to stay away from it. (T. 232-3, 330).

Familia was treated for her injuries at Metropolitan Hospital at approximately seven o'clock that evening. (T. 220). X-rays were taken of her legs and chest, she was given Tylenol and she was placed off-duty from work for three (3) days. (T. 220, 332).

Over the next several days petitioner did not return to Familia's house, although he visited their son at school. (T. 236). According to Familia, her son told her that petitioner informed him that he was sleeping under a bridge at night, suffering a lot, in too much pain and not eating, so she felt sorry for her son. (T. 236, 334). On either September 11 or 12, 2002 Familia witnessed petitioner attempting to break into her home through their son's window. (T. 236-237, 330-1). However, she did not call the police because she did not want her son to see his father taken into police custody. (T. 237).

According to Familia, for the sake of their son, petitioner resumed living in the house on September 12 or 13, 2002, but he and Familia did not speak to each other except for discussions about who would pick their son up from school. (T. 332, 335, 338-339).

On September 17, 2002, petitioner was arrested at his home for the September 10th incident. (T. 233). He was arraigned on September 18, 2002 and a temporary order of protection was issued against him on Familia's behalf, effective through October 3, 2002. (T. 222-223, 225, 233). The order of protection required petitioner to stay away from Familia and/or her home, school, business or place of employment; to refrain from any contact at all with Familia; and to

4

refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating, threatening or committing any other criminal offense against Familia. (T. 225). Although the order of protection prohibited petitioner from being in Familia's house, she never called the police on petitioner, discussed the order of protection with petitioner or requested that the order of protection be vacated. (T. 335-8, 341-2).

On September 30, 2002, petitioner and Familia dropped their son off at school and attended a scheduled court appearance in Family Court, at which a renewed order of protection was issued on Familia's behalf. (T. 235-7). After their appearance in court, both Familia and petitioner returned to Familia's house. (T. 238). Upon arriving, petitioner played a tape recording of an apparent phone conversation between Familia and Ruis three (3) or four (4) days earlier and told Familia that he wanted another chance to change. (T. 238-240, 242, 347, 351). When Familia refused, petitioner hit her in the head with a rubber hammer three (3) times while she was sitting on a couch and told her that he was going to kill her. (T. 242-5, 283-4). When Familia tried to rise from the couch, she fell to her knees because she was dizzy, at which time petitioner hit her with the hammer two (2) to three (3) more times in the breasts, as well as on her left shoulder and ribs. (T. 243-4, 284-6). Familia attempted to escape, but petitioner caught her before she was able to leave the home and struck her again on her right thumb, both sides of her face and in her mouth. (T. 243-245). In total, petitioner struck Familia approximately ten (10) times with the hammer. (T. 259).

Familia testified that she eventually asked petitioner to call an ambulance for the sake of their son. (T. 246, 251). Petitioner called an ambulance, but instructed Familia to say that she had fallen from a stairway. (T. 251).

When the emergency medical technicians (EMTs) arrived, Familia exited the house and entered the ambulance under her own power. (Familia: T. 246, 252, 355; Keller: T. 90, 136-8, 146-7). Familia testified that when one of the EMTs initially asked her what had caused her injuries, she lied and stated that she had fallen down a flight of stairs. (T. 252, 355). According to Familia, she lied because petitioner was right behind her. (T. 252, 355). Craig Keller ("Keller"), one of the EMTs, denied any recollection of Familia telling him that she had fallen down stairs. (T. 141). However, petitioner told Keller that Familia had fallen down a whole flight of stairs into the basement. (Familia: T. 252-253; Keller: T. 95, 102, 141, 162). Once inside the ambulance, Familia told the other EMT, Charles Chen, that she had not fallen down stairs and that petitioner had repeatedly hit her with a hammer. (T. 253).

Familia was transported to the nearest trauma hospital, (Keller: T. 126), where she was treated by Dr. Haomayoun Sasson. (Sasson: T. 296-7). Dr. Sasson, *inter alia*, diagnosed Familia with trauma to the head and right hand; gave her approximately five hundred (500) stitches to the back of her head; and placed a cast on her dislocated right thumb. (Familia: T. 253-6; Sasson: T. 300-2). The results of a CT scan performed on Familia's brain were negative. (Sasson: T. 302). Nonetheless, Sasson testified that Familia likely will have permanent headaches, numbness and "some other issues pertaining to her brain" as a result of the trauma to her head, as well as permanent psychological impairment. (T. 303). Familia was released from the hospital the

6

following day, (Familia: T. 254), but remained out from work for ten (10) months as a result of her injuries. (Familia: T. 259).

The prosecutor inquired of Keller as to whether he had a conversation with Familia at the hospital. (T. 109). In response, Keller testified that he asked Familia at the hospital what had really happened to her and if she had really fallen. (T. 109-110). The trial court initially sustained defense counsel's objection to that question and response, (T. 110), but after argument from both counsel, overruled the objection. (T. 110-4). When the prosecutor repeated the question, Keller testified that he asked Familia if she had really fallen down steps and said to her: "[I]f he did this to you, you need to tell us." (T. 115). The trial court overruled defense counsel's objection to that response. (T. 115). Keller then testified that he said to Familia: "[I]f he did this to you, you need to tell us * * *, it has to be taken care of, meaning he had to be arrested." (T. 115). The trial court again overruled defense counsel's objection to Keller's response, (T. 115), following which defense counsel moved for a mistrial on the basis that Keller's opinion that petitioner had to be arrested was prejudicial. (T. 116). The trial court denied defense counsel's mistrial motion, but instructed the jury as follows:

> "Ladies and gentleman, I say to you the obvious, this witness' opinion as to whether someone should or shouldn't be arrested is really quite irrelevant. I am allowing this because he indicates he had a conversation with the complainant who was lying on a bed or gurney and allegedly said certain things to her, and I am allowing this to complete the narrative and for you to understand any response that she may have made in relation to the comment of this witness. But first of all, the arrest itself would prove nothing. Anyone could be arrested. It doesn't make one guilty of anything. I am allowing it because the witness indicates that he was embarking on a conversation with the alleged victim in the hospital lying on a bed or gurney, * * *. After he indicated what he did to her, I will allow it, so

7

you can understand any response the complainant allegedly made in relation to the question or comments made to her."

(T. 117).

The prosecutor then inquired of Keller whether he said anything else to Familia. (T. 118). In response, Keller testified that he said to Familia, *inter alia*: "[I]f he did this, * * *, next time he is going to kill you." (T. 118). The trial court sustained defense counsel's objection to that response, but denied his motion for a mistrial. (T. 118). The trial court then instructed the jury as follows:

> "The opinion of this witness on a non-medical issue where he's not being qualified as an expert as to legal matters is irrelevant. The jury is instructed to completely disregard it. I am allowing what he said in general because of an alleged response when the People's claim was made. I will allow you to now adduce that response. * * *."

(T. 118).

The prosecutor then inquired of Keller as to whether Familia responded to him. (T. 118). In response, Keller testified that Familia started to cry and told him: "[H]e hit me with a hammer." (T. 118-9). When Keller asked Familia with what kind of hammer she had been hit, Familia told him: "[A] big black hammer." (T. 119). According to Keller, Familia responded in the affirmative when Keller inquired as to whether she meant a rubber mallet. (T. 119).

In a statement to police officer Manuel Mateo at the hospital, Familia indicated that she and petitioner had argued "because of court" and that petitioner had repeatedly hit her with a rubber hammer. (Mateo: T. 199-200). Familia informed Mateo that petitioner was likely picking their son up from school at that time. (Mateo: T. 200-1). According to Detective Leonard Weber, detectives arrested petitioner at his son's school shortly thereafter. (T. 396-7).

8

At the close of the prosecution's case, defense counsel made a general motion to dismiss the indictment on the basis that the prosecutor had not proved a prima facie case "on each and every count of the indictment." (T. 403). However, defense counsel declined to "make any kind of legal argument" with respect to that motion. (T. 403). The trial court denied defense counsel's motion. (T. 404).

b.   <u>The Defense</u>

Prior to presenting any defense, defense counsel informed the trial court that he advised petitioner, *inter alia*, that he should not testify at trial on his own behalf, but indicated that he would call petitioner as a witness should petitioner insist that he wanted to testify on his own behalf. (T. 404-12). Notwithstanding defense counsel's advice, petitioner chose to testify on his own behalf. (T. 413).

i.   <u>Petitioner's Testimony</u>

Petitioner denied ever marrying Familia. (T. 431, 485-7). When questioned about his repeated references to Familia as "his wife," petitioner responded that he called Familia his wife because they were living together, even though they had never married each other. (T. 443, 486-7). According to petitioner, he met Familia in 1987 and they started living together in 1988. (T. 431, 486).

Petitioner testified that in 1993, he discovered that Familia had a relationship with another man, so he "kicked" her, her mother and their son out of the house in which they had been residing in College Point, New York. (T. 432). Thereafter, he met another woman, Divina

9

Perez, whom he married at the end of 1994 or in 1995. (T. 433, 490-1). According to petitioner, once Familia found out he married Divina, she would bring their son over to his house every night and plant evidence suggesting that they were having an affair in his bedroom for Divina to find. (T. 434). As a result, Divina left petitioner, following which he resumed his relationship with Familia. (T. 435). On direct examination, petitioner testified that he eventually bought a house with Familia, as a result of which Divina divorced him. (T. 435-6). However, on cross-examination, petitioner denied ever divorcing Divina. (T. 490-1).

Petitioner testified that beginning in February 2002, he "saw something that's not going right in [his] house," (T. 436), and knew that Familia had a boyfriend. (T. 501). Petitioner denied being angry over that relationship until September 30, 2002, when he found out that Familia was bringing the boyfriend into his house. (T. 501-2). In June 2002, he observed Familia with another man. (T. 436-9). Between July 5, 2002 and August 9, 2002, while their son was in the Dominican Republic, Familia did not return home except on one occasion. (T. 443). Familia then went to the Dominican Republic on August 11, 2002 and stayed there until August 26 or 27, 2002. (T. 445).

Petitioner denied that anything happened on September 10, 2002. (T. 447, 452). According to petitioner, on September 8, 2002, a gentleman called the house and spoke with Familia for fifteen (15) to twenty (20) minutes. (T. 448). Petitioner recorded that telephone conversation and questioned Familia about it the following day, September 9, 2002. (T. 449). He told Familia that if she had anybody else, he could leave, to which Familia responded that he could leave if he wanted, but that she was not telling him to leave. (T. 449). Petitioner then left

10

the house to run an errand and when he returned Familia was gone, so he took a nap. (T. 450). When he awoke, Familia had returned with the police and told them that he had hit her two (2) times. (T. 450). The police officers then told petitioner that he had to leave the house and escorted him out. (T. 450, 505-7). He left, but returned the same night without incident. (T. 451, 507). On cross-examination, petitioner denied being angry with Familia or upset because she had called the police and he had to leave the house. (T. 507-8).

Petitioner testified that on September 15, 2002, he followed Familia after she met "the gentleman," observed them in a compromising position, then took Familia's car while she was in a restaurant with the other man and parked it three (3) blocks from the house because he was upset with her for being with another man. (T. 453-5, 518-9). Petitioner then picked his son up from school, took him to dinner and returned home. (T. 454). Familia returned home at approximately 7:00 p.m. and told her son that someone had stolen her car. (T. 454). Petitioner responded: "If you do bad things to God, God do bad things to you." (T. 455). He then left the room and went to sleep. (T. 455).

Petitioner testified that on September 16, 2002, Detective Tom Ross called and requested that he and Familia go to the precinct the next day. (T. 455-6). When he arrived at the precinct on September 17, 2002, Detective Ross handed him an order of protection and told him that he could not go home. (T. 456-7, 509-12). When petitioner asked why, Detective Ross showed him a photograph depicting one scratch between Familia's breasts and told him that Familia claimed that he had hit her on September 9, 2002. (T. 457). Petitioner denied touching Familia, but Detective Ross arrested him anyway. (T. 457). Petitioner stayed in jail overnight. (T. 458). The

11

next day, he went home despite the order of protection and questioned Familia about it. (T. 458, 510). According to petitioner, Familia grabbed the order of protection and put it in her purse while telling him not to worry, "It's nothing." (T. 458, 511). Petitioner lived in the house from September 17, 2002 until September 30, 2002. (T. 515).

Petitioner testified that on September 29, 2002, he woke up and said that he was going to work, but instead he went to his basement. (T. 458). Between 6:15 a.m. and 9:00 a.m., Familia called Ruis nine (9) times. (T. 458). Familia dropped her son off at her sister's house, returned home to shower and change, then left and met Ruis at approximately 9:15 a.m. (T. 459-60). Familia returned home with her son at approximately 10:30 p.m., then they all went to sleep. (T. 460).

The following morning, September 30, 2002, petitioner was leaving for work when Familia ran up behind him and told him that they had to go to Family Court. (T. 460). They went to Family Court, but were told that the court was too busy that day so they had to return in November. (T. 462). The order of protection was extended until the next court date. (T. 462). On the way home, he asked Familia if she had anybody else and told her that he could go if she did because he did not want any problems with her. (T. 463). According to petitioner, Familia denied having a relationship with any other man, (T. 463, 502), which made him mad. (T. 502). When they returned home, Familia went upstairs to change her clothes and as she was coming back downstairs, he confronted her with a recording of her phone conversation with Ruis. (T. 463, 516). They started arguing and when petitioner went to grab Familia, she ran up the stairs. (T. 463-4). Petitioner followed her upstairs and Familia fell down the stairs as she started to run

12

down. (T. 464, 519). When Familia got up, she walked over to the couch and told petitioner she was bleeding. (T. 464). Petitioner then called an ambulance. (T. 464, 519).

When the ambulance arrived, petitioner assisted Familia to the ambulance and told the EMTs that she had fallen down the stairs. (T. 465, 520). When the EMTs told him that they did not yet know to which hospital they would be taking Familia, petitioner went back inside the house and took a shower. (T. 465-6, 520-1). When he got out of the shower, the ambulance had left and he did not know where they brought Familia, so he ate and "killed time" until he had to pick his son up from school. (T. 465-6, 521). Petitioner was arrested while he was waiting for his son at school. (T. 466).

On cross-examination, the prosecutor questioned petitioner regarding his June 10, 1994 arrest for stabbing a man in the Bronx seven (7) times because he did not want to give him the money that he owed him. (T. 474-5). Petitioner denied the truth of that assertion. (T. 475). The prosecutor then inquired as to whether it was true that on August 21, 1996 petitioner pled guilty to assault in the second degree based upon that arrest. (T. 475). Petitioner's response was that he did not "stab the person." (T. 475). According to petitioner, he did not plead guilty to assault in the second degree, only to a misdemeanor. (T. 475, 479-80). Petitioner also indicated that he did not understand "much English" at the time of his plea and that he had said "yes" to whatever had been written in English and to whatever the judge had said to him at the time of his plea. (T. 475-6, 480-1, 485). Petitioner denied lying to the judge during the plea allocution and testified that he did not "understand 100 percent what [the] words [had] mean[t]." (T. 476-7, 480).

13

According to petitioner, he did not have an interpreter assisting him during those criminal proceedings. (T. 477).

Petitioner further testified on cross-examination that the man whom he allegedly stabbed in 1994, Wilson Carosco, a/k/a "Fernando", used to work for him between1985 and 1989. (T. 526). On June 10, 1994, Carosco went to petitioner's place of employment, handed him some papers and stated that petitioner owed him money from back in 1989. (T. 478, 526). Carosco left, but returned two (2) or three (3) days later with a club and demanded the money. (T. 478, 527-8). When petitioner told Carosco to leave, Carosco allegedly tried to hit him with the club. (T. 478, 528). Petitioner grabbed the club and hit Carosco with it. (T. 478-9, 485, 528). Petitioner denied stabbing Carosco. (T. 479).

Petitioner was sentenced to five (5) years probation based upon his 1996 assault conviction. (T. 481, 530).

On cross-examination, the prosecutor also asked petitioner if, on December 17, 2002, petitioner said the following to Robert Lance ("Lance"):

> "That day I fucked her up. She never said she had another man. She would not admit it. Her sister told me, she was lying to me. I have a tape, and after I played the tape, she sat down. And I pow, pow, pow. I made it like a balloon, and the last one I was getting ready to finish and she said please, please, and I gave her air."

(T. 495). In response, petitioner testified that he told Lance all of his history with Familia because he did not know how to write in English, so Lance would write it for him and give it to petitioner's attorney. (T. 496). According to petitioner, he and Lance "talk[ed] a lot," so he did not remember what he said to him and did not remember making those comments. (T. 496-7,

14

500). When a tape recording of his conversation with Lance was played to refresh his recollection, petitioner denied knowing whether it was his own voice on the tape. (T. 497-8, 500).

ii.     Character Witnesses

The defense also presented two (2) character witnesses, Michael Bergos ("Bergos") and Philip Mamos ("Mamos"), to testify on petitioner's behalf. Bergos and Mamos both testified that they knew petitioner socially for at least ten (10) to fifteen (15) years, respectively, and that petitioner had a reputation in the community for truthfulness, honesty and "peacefulness." (Bergos: T. 566-9; Mamos: T. 597-602).

On redirect examination of Mamos, defense counsel inquired as to what Mamos had heard regarding petitioner's 1996 conviction, to which Mamos responded that he had heard that the assault had been in self-defense, that the case had been "settled" and that petitioner had not gone to jail. (T. 605). Defense counsel then asked Mamos: "[W]ere you aware that I was his attorney?" (T. 605). Mamos responded affirmatively. (T. 605). The trial court sustained the prosecutor's objection and instructed the jury "to make a very earnest effort to disregard that question and answer." (T. 605-6).

On recross-examination, the prosecutor asked Mamos if he was an attorney, to which Mamos responded in the affirmative. (T. 607, 608). The prosecutor then inquired, relative to petitioner's 1996 conviction, as to whether Mamos knew what it meant to represent somebody in court and to plead guilty in court, to which Mamos again responded in the affirmative. (T. 607-

15

8). The prosecutor then asked Mamos: "It wouldn't be violating your oath [as an attorney] if you knew somebody was lying in front of you, lying in front of you, would that be--" (T. 608). The trial court sustained defense counsel's objection to that question and instructed: "The only one on trial in this case is [the petitioner] and counsel's objection is sustained. And the jury is instructed to make every earnest effort to disregard it." (T. 608). The trial court denied defense counsel's subsequent motion for a mistrial. (T. 608-9). When defense counsel requested a sidebar "to make sure [he] ha[d] a timely objection, the trial court indicated that it had already sustained the objection and "instructed the jury to make every earnest effort to disregard it. It's not relevant to the case." (T. 609). The trial court also denied defense counsel's motion to strike the entire recross-examination. (T. 614-9).

c.  Rebuttal

The prosecutor called Lance as a rebuttal witness in light of petitioner's equivocation regarding whether his voice was the one heard on the recording played during his cross-examination. (T. 624). Lance testified that on December 17, 2002, he was incarcerated at Riker's Island and had a conversation with petitioner while wearing a wire. (T. 627-8). Lance then authenticated the recording of his conversation with petitioner on that date, (T. 628-9), and testified that the voices heard on that recording were his and petitioner's. (T. 632, 635). Lance further testified that during his conversation with petitioner, petitioner physically reenacted what had occurred by getting down on his knees, showing how Familia begged him not to hit her again and swinging his arms "as if he had the rubber hammer." (T. 632-4, 636). Only the portion of

16

the recording that was played during petitioner's cross-examination was admitted into evidence. (T. 630-1).

3.  Verdict and Sentence

Following a jury trial, petitioner was found guilty of attempted murder in the second degree (N.Y. Penal Law §§ 110.00, 125.25); two (2) counts of assault in the first degree (N.Y. Penal Law § 120.10(3)); assault in the second degree (N.Y. Penal Law § 120.05(2)); aggravated criminal contempt (N.Y. Penal Law § 215.52); three (3) counts of criminal contempt in the first degree (N.Y. Penal Law § 215.51(d)); criminal contempt in the second degree (N.Y. Penal Law § 215.50(3)); assault in the third degree (N.Y. Penal Law § 120.00(1)(2)); and two (2) counts of criminal possession of a weapon in the fourth degree (N.Y. Penal Law § 265.01). (T. 832-3).

On October 28, 2003, petitioner was sentenced, as a second violent felony offender, (S. 14-9), to, *inter alia*: (a) concurrent determinate terms of imprisonment of fifteen (15) years for each of the convictions of attempted murder and assault in the first degree, seven (7) years for the conviction of assault in the second degree and one (1) year for each of the convictions of criminal contempt in the second degree, assault in the third degree and criminal possession of a weapon in the fourth degree; and (b) concurrent indeterminate terms of imprisonment of three and one-half (3 ½) to seven (7) years for the conviction of aggravated criminal contempt and two (2) to four (4) years for each of the convictions of criminal contempt in the first degree, all sentences to run concurrently to each other. (S. 63-65).

B.    Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York Appellate Division, Second Judicial Department on the grounds, *inter alia*: (1) that he was denied the effective assistance of counsel; (2) that the trial court's Sandoval ruling was incorrect; (3) that the trial court improperly denied his two (2) mistrial motions; (4) that the evidence was legally insufficient to support his conviction; and (5) that his sentence was excessive.

On May 15, 2007, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*: (1) that petitioner's legal insufficiency claim was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2) and that, in any event, the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (2) that the verdict was not against the weight of the evidence; (3) that the trial court's ruling pursuant to People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), did not require reversal; and (4) that petitioner's remaining contentions were without merit. People v. Gouvatsos, 40 A.D.3d 879, 837 N.Y.S.2d 174 (2d Dept. 2007). On August 22, 2007, the New York State Court of Appeals denied petitioner leave to appeal the order of the Appellate Division. People v. Gouvatsos, 9 N.Y.3d 876, 842 N.Y.S.2d 788, 874 N.E.2d 755 (2007).

In June 2007, petitioner moved pursuant to New York Criminal Procedure Law § 440.10 to vacate his judgment conviction on the basis that he was denied the effective assistance of counsel at trial by his counsel's failure to investigate and to request a pre-trial hearing pursuant to People v. Massiah, 377 U.S. 201 (1964) (the "440.10 motion"). By order dated September 24, 2007, the trial court (Erlbaum, J.) denied petitioner's 440.10 motion as procedurally barred

pursuant to N.Y. C.P.L. §440.10(2)(c) because the issues raised were based on matters appearing in the record, and, thus, should have been raised on petitioner's direct appeal from the judgment of conviction. People v. Gouvatsos, No. 3758/2002 (N.Y. Sup. Ct. Sept. 25, 2007). On January 7, 2008, the Appellate Division, Second Department (Florio, J.) denied petitioner leave to appeal the order denying his 440.10 motion. People v. Gouvatsos, No. 2007-10319 (2nd Dept. Jan. 7, 2008).

On or about May 12, 2008, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging: (1) that he was denied the effective assistance of counsel by the failure of his trial counsel to raise objections as to the order of proof on two (2) occasions during the trial, to object to the admissibility of certain evidence at trial and to object to the trial court's Sandoval ruling; (2) that the trial court improperly denied his two (2) mistrial motions; and (3) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt.

## II.    DISCUSSION

### A.    Procedurally Defaulted Claims

Petitioner argues that his conviction in state court was based on "unreliable" evidence that was legally insufficient to establish his guilt beyond a reasonable doubt. (Petition for Writ of Habeas Corpus [hereinafter Pet.] at 3).

Pursuant to the independent and adequate state ground doctrine, a federal habeas court will not review a federal claim rejected by a state court "if the decision of [the state] court rests

on a state law ground that is independent of the federal question and adequate to support the judgment." Beard v. Kindler, 130 S.Ct. 612, 614, 175 L.Ed.2d 417 (2009) (insertion in the original) (quoting Coleman v. Thomson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)); see also Cone v. Bell, 129 S.Ct. 1769, 1780, 173 L.Ed.2d 701 (2009). A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 749-50, 111 S.Ct. 2546; see also Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). In order for federal habeas review to be procedurally defaulted, the state court's reliance on state law must be "clear from the face of the opinion." Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted); see also Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006). If a state court holding contains a plain statement that a claim is procedurally defaulted, then the federal habeas court may not review it, even it the state court also rejected the claims on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); see also Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007).

20

The Appellate Division, Second Department rejected petitioner's legal insufficiency claim as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2), then ruled, in any event, that the claim was without merit because the evidence at trial was "legally sufficient to establish the [petitioner's] guilt of the crimes charged beyond a reasonable doubt." <u>People v. Gouvatsos</u>, 40 A.D.3d 879, 879, 837 N.Y.S.2d 174 (2d Dept. 2007). Since the Appellate Division clearly invoked an independent and adequate state procedural rule as a basis for its rejection of petitioner's legal insufficiency claim, and petitioner has not established cause for the default, actual prejudice, or that it would be a fundamental miscarriage of justice if that claim were not reviewed, that claim is barred from federal habeas review.

B.    Claims Adjudicated on the Merits

1.    <u>Standard of Review</u>

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. §2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. Pursuant to 28 U.S.C. §2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites:

> "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

Once claims have been adjudicated on the merits, a federal habeas court may grant the writ if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," Thaler v. Haynes, 130 S.Ct. 1171, 1173-4 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)); or (2) "the 'state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case.'" Id. at 1174 (citing Williams, 529 U.S. at 413, 120 S.Ct. 1495). Under the "unreasonable application" standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be 'objectively unreasonable.'" Renico v. Lett, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (quoting Williams, 529 U.S. at 411, 120 S.Ct. 1495).

Under AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings * * * and demands that state-court decisions be given the benefit of the doubt." Renico, 130 S.Ct. at 1862 (internal quotations and citations omitted).

## 2.  Ineffective Assistance of Counsel Claim

Petitioner contends that his trial counsel was ineffective, *inter alia*, for failing to object: (1) to the admission into evidence of the Lance recording; (2) to the trial court's <u>Sandoval</u> ruling; and (3) to the order of proof during trial on two (2) occasions[1].

The Sixth Amendment provides, *inter alia*, that a criminal defendant "shall enjoy the right...to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. In order to establish a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove both: (1) constitutionally deficient performance, i.e., that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms;" and (2) prejudice arising from the alleged deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 687-94, 104 S.Ct. 2052, 80 L.Ed. 2d (1984); <u>see</u> <u>Berghuis v. Thompkins</u>, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (2010); <u>U.S. v. Caracappa</u>, 614 F.3d 30, 46 (2d Cir. 2010), <u>cert. denied</u>, ___ S.Ct. ___, 2010 WL 4220584 (Nov. 29, 2010). In order to prevail on an ineffective assistance of counsel claim on federal habeas review, a petitioner must overcome the "substantial deference" due to state court determinations under AEDPA "and establish that the state court's decision on ineffective assistance was contrary to, or an unreasonable application of, Strickland." <u>Rosario v. Ercole</u>, 601 F.3d 118, 123 (2d Cir. 2010).

---

[1] Following the direct examination of Familia, the trial court, on consent, allowed the prosecution to call Dr. Sasson as a witness prior to defense counsel's cross-examination of Familia because Dr. Sasson had professional obligations elsewhere. (T. 291-2). The trial court instructed the jury on the reason for the deviation in the order of proof. (T. 291-3).

a.    Deficient Performance

Under the first prong of Strickland, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Knowles v. Mirzayance, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052); Caracappa, 614 F.3d at 46. Under this standard, "[j]udicial scrutiny of counsel's performance must be highly deferential." Knowles, 129 S.Ct. at 1420. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689; see also Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009), cert. denied, 130 S.Ct. 1881, 176 L.Ed.2d 403 (2010), and the court should review the circumstances "from counsel's perspective at the time" of the trial. Strickland, 466 U.S. at 689; see also Parisi v. United States, 529 F.3d 134, 141 (2d Cir. 2008), cert. denied, 129 S.Ct. 1376, 173 L.Ed.2d 632 (2009). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" in habeas corpus proceedings. Knowles, 129 S.Ct. at 1420, 1421 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).

Petitioner has not pointed to any defect in his trial counsel's representation that fell below an objective standard of reasonableness under prevailing professional norms existing at the time of his trial.  Trial counsel, *inter alia*, reasonably advised petitioner not to testify on his own behalf at trial but, nevertheless, presented a fair defense at petitioner's insistence; interposed timely and appropriate objections; effectively examined and cross-examined witnesses; and delivered rational opening and closing statements and legal arguments.  Moreover, defense counsel: (1) was effective, *inter alia*, in having his objections to the prosecutor's allegedly

24

inappropriate examinations of Keller and Mamos sustained and the jury appropriately instructed accordingly; and (2) appropriately, albeit unsuccessfully, moved for a mistrial on two (2) occasions thereafter, resulting in further instructions to the jury. In addition, trial counsel's advice to petitioner not to testify at trial, *inter alia*, to avoid opening the door on cross-examination regarding his prior conviction and the Lance recording, was objectively reasonable. Petitioner's failure to heed his counsel's advice and decision to testify nonetheless constitutes a mere disagreement over trial strategy which is insufficient to establish that he was deprived of the effective assistance of counsel.

b.    <u>Prejudice</u>

In any event, petitioner has failed to demonstrate a reasonable probability that the outcome of the trial would have been different had counsel objected to the challenged evidence and trial court rulings. <u>See</u> <u>Strickland</u> 466 U.S. at 687-94. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." <u>Knowles</u>, 129 S.Ct. at 1422, 173 L.Ed.2d 251 (quoting <u>Strickland</u>, 466 U.S. at 694); <u>Rosario</u>, 601 F.3d at 123. In light of the overwhelming evidence of petitioner's guilt of the crimes for which he was convicted, petitioner has not established that any alleged deficiency in his trial counsel's performance in failing to object to the challenged evidence and rulings "undermine[d] confidence in the outcome" of the trial.

Since petitioner has not demonstrated that the Appellate Division's denial of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the

evidence presented at trial, 28 U.S.C. § 2254(d), habeas relief is not warranted on his ineffective assistance of trial counsel claim.

2. <u>Evidentiary Rulings</u>

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." <u>Wilson v. Corcoran</u>, 131 S.Ct. 13, 16 (2010) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). As such, challenges to the admissibility of evidence are cognizable on habeas review only if petitioner can establish that the decision to admit the evidence rendered the trial so fundamentally unfair as to deny him or her due process of law. See <u>Dunnigan v. Keane</u>, 137 F.3d 117, 125 (2d Cir. 1998); <u>see also</u> <u>McKinnon v. Superintendent, Great Meadow Correctional Facility</u>, 355 Fed. Appx. 469, 473 (2d Cir. Nov. 19, 2009) ("[U]nless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable [on federal habeas review].") An erroneous evidentiary ruling does not amount to a constitutional violation unless the evidence in question was "so extremely unfair that its admission violate[d] fundamental conceptions of justice." <u>Dunnigan</u>, 137 F.3d at 125 (citing <u>Dowling v. United States</u>, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 [1990]). In order to constitute a denial of due process, the prejudicial evidence erroneously admitted "must have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." <u>Id.</u> (internal quotations and citations omitted); <u>see also</u> <u>McKinnon</u>, 355 Fed. Appx. at 473. In short, the erroneously admitted evidence must have been "crucial, critical, highly significant." <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985).

a.     Sandoval Ruling

Petitioner contends that "the [trial] Court's <u>Sandoval</u> ruling constituted an abuse of discretion" because the admission of evidence had "greater prejudicial value than probative." (Pet. at 7).

"The <u>Sandoval</u> ruling is a matter of state law as to the admissibility of evidence, the purpose of which is to provide the defendant with a prospective ruling on the possible use of defendant's prior bad acts by the prosecution for the purpose of impeachment." <u>Ayala v. Ercole</u>, No. 06-CV-1747, 2007 WL 1135560, at \*14 (E.D.N.Y. Apr. 17. 2007); <u>see also</u> <u>Sims v. Ercole</u>, No. 09 Civ. 4398, 2010 WL 1685434, at \* 6 (S.D.N.Y. Apr. 23, 2010) (holding that a <u>Sandoval</u> claim presents a state evidentiary issue). Accordingly, a challenge to a state court's <u>Sandoval</u> ruling is only redressable in a federal habeas corpus proceeding if the petitioner can establish that the prosecutor's use of his prior convictions or bad acts on cross-examination rendered the trial fundamentally unfair. <u>See generally</u> <u>Dunnigan</u>, 137 F.3d at 125; <u>Sims</u>, 2010 WL 1685434, at \* 6 (holding that federal habeas relief is only available to redress an erroneous evidentiary ruling in a state court proceeding if the error denied the petitioner a fundamentally fair trial); <u>William v. Greiner</u>, No. 02-CV-1116, 03-MISC-0066, 2003 WL 23198759, \*11 (E.D.N.Y Nov. 26, 2003) (holding that generally, state court rulings on evidentiary matters, including rulings on the permissible extent of cross-examination should the defendant testify, are matters of state law that do not raise constitutional issues and are not reviewable by a federal habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness).

Petitioner has not established any error, under state or federal law, with respect to the trial court's Sandoval ruling. The trial court did not abuse its discretion under state law in allowing the prosecution to cross-examine petitioner regarding his prior assault conviction, see generally People v. Avila, 69 A.D.3d 642, 642, 892 N.Y.S.2d 515 (2d Dept. 2010), lv. denied, 14 N.Y.3d 838, 901 N.Y.S.2d 144, 927 N.E.2d 565 (2010), since that conviction was relevant to the issues of petitioner's credibility as a witness and willingness "to place the advancement of his self-interest ahead of principle or of the interests of society." People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413, 417-18 (1974); see also People v. Calvert, 266 A.D.2d 226, 226, 697 N.Y.S.2d 658 (2d Dept. 1999) (holding that the trial court properly permitted the prosecution to elicit defendant's two prior assault convictions on cross examination as those convictions spoke to the defendant's willingness to place his own interests above those of society).

In any event, any error in the admission of evidence regarding petitioner's prior conviction did not deprive petitioner of a fundamentally fair trial, particularly in light of the overwhelming evidence of petitioner's guilt. See, e.g. McKinnon, 355 Fed. Appx. at 473 (finding that the admission of evidence regarding petitioner's prior bad acts was not so unfairly prejudicial as to affect the fundamental fairness of the trial since, *inter alia*, other evidence established that the petitioner had committed the crime and the petitioner could not demonstrate that the challenged evidence had a "substantial and injurious effect on the verdict."); Sims, 2010 WL 1685434, at * 6 (finding that the petitioner was not deprived of a fundamentally fair trial since the evidence of his guilt was substantial); Senor v. Greiner, No. 00-CV-5673, 2002 WL 31102612, at *13 (E.D.N.Y. Sept. 18, 2002) (finding the petitioner's Sandoval claim to be without merit where, *inter alia*, even assuming

the trial court erred in permitting cross examination about petitioner's prior drug conviction, the petitioner failed to demonstrate that the ruling influenced the jury's verdict in any way in light of the abundant evidence of petitioner's guilt).

Since any error in the trial court's <u>Sandoval</u> ruling does not rise to constitutional dimensions, petitioner's <u>Sandoval</u> claim is not cognizable on federal habeas review. <u>See</u> <u>McKinnon</u>, 355 Fed. Appx. at 473.

3.    <u>Mistrial Motions</u>

Petitioner contends that the trial court erred in denying the motions for a mistrial that his defense counsel made during the testimony of Keller on direct examination and of Mamos on recross-examination.

Whether petitioner's claim is viewed as a challenge to a state court trial ruling relative to the prosecutor's conduct at trial, or as a direct challenge to the prosecutor's conduct at trial, petitioner must establish not only that the prosecutor's questions or remarks were improper, but also that the remarks were "of sufficient significance to result in the denial of the defendant's right to a fair trial," <u>see</u> <u>Greer v. Miller</u>, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); <u>Blissett v. Lefevre</u>, 924 F.2d 434, 440 (2d Cir. 1991); <u>see</u> <u>also</u> <u>Floyd v. Meachum</u>, 907 F.2d 347, 353, 355 (2d Cir. 1990), and, thus, that the trial court's denial of defense counsel's mistrial motions relating to those allegedly improper questions also violated petitioner's due process rights. In determining whether the petitioner was deprived of a fundamentally fair trial, the prosecutor's questions or remarks must be considered in the context of the entire trial. <u>See</u> <u>Greer</u>, 483 U.S. at 765-6, 107 S.Ct. 3102;

29

Blissett, 924 F.2d at 440. "The severity of the misconduct, curative measures, and the certainty of conviction absent the misconduct are all relevant to the inquiry."[2] Blissett, 924 F.2d at 440; Floyd, 907 F.2d at 353, 355; see also U.S. v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998).

Initially, the trial court did not err in denying defense counsel's mistrial motions because the challenged inquiries did not constitute misconduct on the part of the prosecutor, much less misconduct of such severity as would warrant a mistrial, since the prosecutor ended her examinations promptly once the trial court sustained defense counsel's objections and there is no other evidence indicating that the prosecutor purposefully engaged in pervasive misconduct throughout the trial. See U.S. v. McCarthy, 54 F.3d 51, 55-6 (2d Cir. 1995). In any event, the measures taken by the trial court, i.e., sustaining defense counsel's objections, striking the improper testimony and giving curative instructions to the jury, alleviated any prejudice that otherwise might have resulted to petitioner from the prosecutor's arguably imprudent questions. See Galdamez v. Keane, 394 F.3d 68, 78 (2d Cir. 2005) (finding that the curative instructions given by the trial court alleviated any potential error to the petitioner); see also U.S. v. Scala, 266 Fed. Appx. 41, 44 (2d Cir. Feb. 22, 2008) (finding that the measures taken by the court, i.e., immediately striking the evidence and properly instructing the jury, sufficiently cured any prejudice that otherwise might have resulted from the government's imprudent line of questioning); McCarthy, 54 F.3d at 56 (finding that the cautionary jury instructions given by the trial court cured any potential prejudice to the defendant). In light of the relatively isolated nature of the challenged questions in the context of the entire trial; defense counsel's immediate objections to those questions, which were sustained by the trial court;

---

[2] Those factors are equally applicable on collateral attack of a state court conviction as on direct appeal from a federal conviction. Floyd, 907 F.2d at 355.

the curative jury instructions given by the trial court; and the substantial evidence of petitioner's guilt of the crimes for which he was convicted, the prosecutor's arguably improper questions, and the trial court's denial of defense counsel's mistrial motions relating to those questions, did not deny petitioner a fundamentally fair trial. See, e.g. Greer, 483 U.S. at 766, 107 S.Ct. 3102 (finding that the sequence of events– the single improper question posed by the government, defense counsel's immediate objection thereto and the two curative instructions given by the court–, together with sufficient evidence of the defendant's guilt, clearly indicated that the improper question did not violate the defendant's due process rights); Scala, 266 Fed. Appx. at 44-5 (finding that the defendant was not deprived of a fair trial in light of the isolated nature of the government's improper questions and the strength of the evidence of the defendant's guilt); Blissett, 924 F.2d at 441 (finding that the prosecutor's improper remarks did not deny the petitioner a fundamentally fair trial where the misconduct was not "pervasive" or part of a "persistent" trial strategy, the trial judge responded promptly to the objections and twice instructed the jury to disregard the offending testimony and there was sufficient evidence of the petitioner's guilt).

Since petitioner did not demonstrate that the state court's denial of his mistrial motions relating to the prosecutor's allegedly improper questions violated federal law or was of constitutional magnitude, this claim is not cognizable on federal habeas review.


III.    CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. §2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.



SANDRA J. FEUERSTEIN
United States District Judge

Dated: December 13, 2010
      Central Islip, New York